IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

AUTRY COLEMAN,

          Plaintiff,

vs.

Case No. 04-1315-JTM

UNION PACIFIC RAILROAD COMPANY,

          Defendant.

MEMORANDUM AND ORDER

      This is an action for racial harassment, discrimination, and retaliation by plaintiff Autry Coleman against his employer, Union Pacific Railroad Company. The matter is now before the court on the motion for summary judgment of the defendant.

      Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

      In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and

significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Coleman, who is African-American, has been continuously employed with defendant Union Pacific since April 18, 2000. He was hired and employed as an assistant signalman until July 2003 when, after completing his training program, he was promoted to signalman.

When he began his employment with Union Pacific, Coleman was assigned to Gang 8617 – a discrete group of signal installation and repair employees who work in the field at remote work sites. Because of a Coleman family emergency, Gail Nelson, the Manager of Signal Construction until the late summer of 2003, arranged to transfer Coleman to Gang 8618, to allow Coleman to be closer to his home.

Gangs and crews are responsible both for repairing and charging storage batteries, and for constructing, repairing, assembling, and wiring signal apparatus. They are also responsible for installing control points along the railroad tracks. Steve Ondrak was the foreman and Richard Jepson the lead signalman of Gang 8618. As Manager of Signal Construction, Gail Nelson was Ondrak's direct supervisor. In late summer 2003, Gang 8618 was transferred to another Manager of Signal Construction, Pat O'Connor.

Gang 8618 consisted of approximately ten to twelve employees. Members of a "gang" are typically assigned to work in a smaller "crew" of four to six employees. Coleman and one other employee had the same seniority date and were the least senior employees on Gang 8618. Typically,

within a work crew of four employees, Coleman was the employee with the least amount of seniority. He was the only African-American on the gang.

Each morning, Ondrak would assign each employee on each crew to a job based on the employee's experience and seniority. Typically, two signalmen on a crew would perform actual wiring and other technical work, while one would operate a backhoe or trencher, and the other would perform various manual and clean-up work.

As an assistant signalman, Coleman was not yet certified or qualified to perform the actual repair, assembly, and wiring work. He was assigned primarily to dig with a backhoe, operate a trench to run cables underground, operate a boom truck, and do some hand digging.

Typically, the more senior employees (unless doing the actual wiring) would be assigned to or choose to run the backhoes and the trenches, which left the shoveling and the watchman jobs to Coleman. He worked with the backhoe and the trencher if the more senior employees allowed him to do so. Oftentimes other employees would permit Coleman to do some of the wiring or train him to do other tasks. According to Coleman, when Ondrak came out into the field and discovered that he was not doing the job he was assigned to do, Ondrak would instruct him to return to his previously assigned job.

On-the-job training required two people to do one job, as the employee being trained was pulled from his assigned job. This practice slowed the gang's production.

While on Gang 8618, Coleman was never disciplined. The only discipline Coleman received during his employment with Union Pacific was when he was issued a verbal warning due to an accident when he backed a piece of equipment into a signal, causing damage. This occurred after he voluntarily transferred off Gang 8618. Coleman admits that the discipline was warranted, and other, non-African-American employees have received the same discipline for similar accidents, and that this warning did not go on Coleman's permanent record.

Union Pacific maintains a zero tolerance Equal Employment Opportunity/Affirmative Action Policy (EEO policy) prohibiting harassment, discrimination, and retaliation. It was revised and

redistributed to Coleman on January 21, 2002. At the time he was hired, Coleman was trained on Union Pacific's EEO policy and informed of various methods to complain of any possible race or other discrimination or harassment, including calling Union Pacific's EEO Department via a 1-800 number. The revised January 2002 EEO policy provided a 24-hour hotline number for employees to report all violations, even if an employee had discussed the violation with his foreman, supervisor, or manager.

Coleman knew of Union Pacific's policies prohibiting harassment and the EEO toll-free number for reporting unwanted and offensive conduct, and he kept it in his daily work planner.

Coleman was a member of the Brotherhood of Railroad Signalman Union, which governed his employment relationship with Union Pacific. Under their Collective Bargaining Agreement (CBA), signalmen and assistant signalmen are required to bid on available positions, and the assignment of those positions is based on seniority. An assistant signalman is "[a]n employee in training for positions coming within the [CBA] … working under the direction of a signalman, signal maintainer, or signal inspector, and performs work generally recognized as signal work." (CBA, at 193). A signalman is in Seniority Class 1, while an assistant signalman is in Seniority Class 2; assistant signalmen thus have less seniority than signalmen for bidding purposes.

Each gang is assigned to a district or territory within the United States, which is divided into four work zones. A gang working outside of its regularly assigned work zone is entitled to "receive one and one-half time pay, up until the employees of the gang qualify for double-time, at which time they will be paid at the double-time rate." (Def. Exh. B, at 48-49, and 57-62).

Lead signalmen (like all other signalmen and assistant signalmen) are hourly employees and covered by the union contract between Union Pacific and the Brotherhood of Railroad Signalman Union. Lead signalmen spend virtually all of their time performing the same duties as the signalmen and assistant signalmen. Lead signalmen may facilitate the direction of the signalmen in their small group during the work day. This would include, for example, ensuring that the signalmen adhere to

all of the company's safety rules, monitoring signalmen's work progress, overseeing the completion of foreman's job assignments, and assisting the signalmen in signal construction.

Jepson did not have the authority to hire, fire, transfer, discipline, or terminate any employee. Jepson also worked on a crew doing signalman's work just like all of the other employees. As a lead signalman, Jepson would be left in charge if Ondrak was on vacation or away from the sites. Coleman testified that there were times where Ondrak would assign Jepson to be the lead person in the small groups, and Jepson would appoint someone else to take charge of the group. Jepson would assign himself to perform manual work, such as hauling away debris and cleaning up after the crew was finished working on the site. Jepson did not like performing the technical work or the wiring, and instead, did most of the backhoe work.

In early 2002, Jepson heard another co-worker, Bill Alaimo, use a racially derogatory term in Coleman's presence; Jepson reported it to Ondrak. Upon hearing the racial comment, Jepson offered Coleman the 1-800 number for the EEO department at Union Pacific that was printed on Jepson's hard hat so he could report the violation. Nelson contacted Coleman the same day the comment was made, and Coleman told Nelson that he was not offended by the comment. Coleman then wrote Nelson thanking him for the way in which he conducted the investigation and for Nelson's support, and further advised that he keeps the EEO hotline number on his daily work planner and is "thankful for UP's excellent EEO policy." (Pretrial Order Stipulation ¶ 16).

On June 12, 2003, Coleman called the company's toll free number, to report a racial comment made by Jepson. Coleman's complaint was that Jepson had twice on the same occasion used the terminology "African engineering," in describing work performed without the proper materials. Coleman was on vacation after he reported Jepson's comment, but when Coleman was first available (around June 17), Nelson visited him in Liberal, Kansas, and conducted an investigation into Coleman's allegations. During the interview, Nelson told Coleman that he would not tolerate the use of racial slurs in the work place, and that there would be consequences if someone was using racial slurs.

5

During the investigation, Coleman told Nelson that he had heard Jepson use the word "nigger" in Fall 2001, but had not reported it to Union Pacific; instead Coleman said he had addressed the issue directly with Jepson, and Jepson apologized, and Coleman never heard Jepson use the term again.

As a result of the investigation (including interviews of other employees on the gang), Union Pacific disciplined Jepson and required him to participate in anti-harassment training. Jepson was required on his own time and at his own expense to travel to Omaha, Nebraska, to participate in the day-long training and sensitivity program. After Jepson received this training, Coleman did not experience any further incidents of alleged harassment by Jepson, and did not report any additional incidents of harassment or discrimination.

In his deposition, Coleman identified two other alleged racial slurs which had occurred prior to the 2003 investigation by Nelson: first, a comment by Jepson in May of 2002 referring to Coleman as a "big old digger" in May 2002, and, second, a comment by Ondrak in late 2001 that "this is a white man's railroad up north." Coleman did not ever report either comment to anyone at Union Pacific. In the Pretrial Order entered on August 30, 2005, Coleman, for the first time in this lawsuit, contended that he was subjected to the term "monkey without a tail." Coleman never reported this alleged comment to Union Pacific or alleged its occurrence in his charge of discrimination.

Coleman has complained of Ondrak "throw[ing] tantrums and … pick[ing] one of us out and just put[ting] all of his frustrations on him." (Coleman dep. at 172). According to Coleman, Ondrak would yell at someone every morning. Coleman agrees that there were a lot of personality disputes and conflicts between the employees on Gang 8618 during the time Coleman was working on this gang. Coleman has experienced personality disputes on other crews as well. The personality disputes that went on between the gang members did not have anything to do with Coleman's race or EEO complaint. Exhibit A, Coleman depo. pp. 116-117.

Even in the context of discussing the use of racially derogatory terms, Coleman testified at his deposition that his impression of Jepson was that he was a "simple man" without much "basic common sense" and "ignorant in a lot of things," but that Coleman still thought he was a "good person at heart, [who would] do anything for any of the guys." (Coleman dep. at 133-134).

Prior to June 2003, as an assistant signalman, Coleman claims to have spent most of his time doing manual-type labor. He testified that he was not permitted to do some of the more sophisticated wiring and more technical jobs because he was only an assistant signalman, and until he was promoted to a signalman in July 2003 he was not certified to do that work. He did not complain to Union Pacific that he was being denied the opportunity to do more technical jobs.

Coleman also states that he was given old pliers, old company supplies, an old cable-stripping kit, and old boots in the winter of 2003, while all of the other gang members were given new boots and new gloves. As noted earlier, however, Coleman was the least senior employee on the gang during that time period. Further, all equipment and tools are assigned to a truck, not any employee, and each employee on the gang uses and has access to all of the tools and equipment on the truck. Coleman did not complain to Union Pacific that he was being given old or inferior tools or equipment.

In 2002, while working at a job in Oklahoma, Coleman was allowed to use the company truck to go in to town to use the restroom; the town was approximately five miles away and each bathroom break took approximately twenty-five minutes. In July of 2003, a Port-a-John was brought to each work site. Coleman was never prevented from using the restroom or disciplined for using the restroom. Prior to bringing a Port-a-John to the work sites, Coleman and other crew members were taking long restroom breaks during the day, which was unproductive. In addition, the company trucks contained the radios and all of the tools the crew needed to complete their job assignments. If the trucks were off-site, the rest of the crew could not access the tools or use the radio for emergencies. The use of port-a-potties eliminated the need for Coleman and the other gang members to use the company trucks to use the restroom. No gang members were permitted to use the trucks

to leave the work site to use the restroom after the port-a-potties were brought onsite. Coleman did not complain to Union Pacific that he was not permitted to use the company vehicle to use the restroom while other non-African American employees were.

Coleman testified that all assistant signalmen and signalmen received the same formal training. He received two weeks of training in signalman classes at each six-month interval during his first two years of employment with Union Pacific, which was the same training at the same intervals that all signalmen received. He completed all four phases of signalman training and was promoted to a Class 1 signalman in July 2003.

In July 2003, Gang 8618 was assigned to a job site in Boone, Iowa, out of its designated work zone, and the entire gang (including Jepson and Ondrak) was awarded time-and-a-half for all hours worked on this job in accordance with the CBA. According to Coleman, Gang 8618 was awarded the Boone, Iowa, job because Nelson was impressed with the work the gang had done in the past, and Nelson rewarded the gangs that generally came in under budget or came within budget on their assignments by awarding them these special jobs. Gang 8618 had been assigned to several out-of-zone jobs receiving time-and-a-half pay for approximately one year until it was transferred from the Boone, Iowa, site in approximately September 2003, to an "in zone" assignment. The decision to transfer Gang 8618 back into its zone and assign another gang to the Boone, Iowa, project was done so that the new manager over the gang could give other gangs a reward and opportunity to earn the time-and-a-half "out of zone" pay.

The time-and-a-half pay for "out of zone" work was not overtime pay under the CBA.

After June 12, 2003, while on Gang 8618, (and after being promoted on July 1, 2003 to signalman), Coleman was allowed to do more technical work, including wiring work. He was also allowed to use the backhoe, the boom and the trencher and all other machine type equipment. Around this time, Ondrak had a port-a-potty brought on-site for Coleman and the gang members to use.

On January 16, 2004, Coleman filed a Charge of Discrimination with the Kansas Commission on Human Rights which was dual-filed with the U.S. Equal Employment Opportunity Commission. Coleman left Gang 8618 in March 2004 when he voluntarily bid on and was awarded a job on Gang 8616.

Since Coleman has left Gang 8618, he has not had any problems in terms of people making racial remarks.  The EEOC issued a determination on May 13, 2004, and issued a Notice of Right to Sue dated June 25, 2004.

**Conclusions of Law**

Union Pacific seeks dismissal of Coleman's claims of racial harassment, contending that the alleged conduct was not severe or pervasive, citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (hostile work environment arises when "the workplace is permeated with discriminatory intimidation, ridicule, and insult"); *Faragher v. City of Boca Raton*, 524 U.S. 775, 781 (1998) (Title VII prohibits conduct so severe as to change the terms and conditions of employment; it does not police "the ordinary tribulations of the workplace, such as the sporadic use of jokes, abusive language, \*\*[race] related jokes, and occasional teasing"); *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (actionable harassment claim exists when plaintiff faced a "steady barrage of opprobrious racial comments").

The defendant's argument is well-founded.  Here the plaintiff personally observed two or three racially-charged comments over the course of several years.  None of the comments was directed at Coleman personally.  The cited conduct, while reprehensible, simply does not raise the level of a pervasively hostile work environment.  Rather, plaintiff was subjected to a very limited number of instances of the use of opprobrious language.  This does not present a case of a pervasively hostile work environment.  *See Witt v. Roadway Exp.*, 136 F.3d 1424, 1428-29 (10th Cir. 1998).

Further, even if the comments by Jepson were sufficient in their severity to state for harassment, Union Pacific is not responsible for them because Jepson was not Coleman's supervisor. Coleman stresses that Jepson was a lead signalman in the gang. But the evidence shows that Jepson had no authority to hire or fire any member of the gang, or to permanently change the workers' duties. Instead, Jepson did much the same technical and manual work as Coleman himself, and had no firing or disciplinary power.

Vicarious liability for harassment exists only if the injured worker's supervisor played a role in the harassment. *Faragher*, 524 U.S. at 807-08. In this context, supervisory power does not exist merely because a co-worker has been designated as a team leader who can give members of the team specific and temporary tasks, without the authority to make any decision which would alter the tangible job duties of the members of the team. *Weyers v. Lear Operations Group*, 359 F.3d 1049, 1057 (8th Cir. 2004).

The court finds that Coleman's complaint regarding the allegedly harassing conduct by Ondrak is not properly before the court. Coleman made no mention of any improper conduct by Ondrak in any complaint to Union Pacific prior to this case, nor in his administrative charge, nor even in his Complaint in the present action. Instead, Coleman mentioned this alleged conduct for the first time in his deposition in 2005.

In addition to his claim of racial harassment, Coleman also alleges that he was subjected to racial discrimination by Union Pacific in that it did not allow him to do more advanced, technical job assignments, use the company truck to go to the restroom, use newer tools, train for more advanced jobs, or allow him "overtime pay." The court finds that Coleman's racial discrimination claims fail on multiple grounds. First, the alleged conduct did not fundamentally alter Coleman's job status or affect his benefits. He stayed in his position, receiving training and performed some technical work, until he was promoted. Second, Coleman has failed to show that any similarly-situated, non-African-American members of the gang were treated differently with respect to their training, tools, or pay.

Moreover, even assuming Coleman had demonstrated a prima facie case of race discrimination based on the cited events, Union Pacific would still be entitled to summary judgment because it has demonstrated a legitimate, nondiscriminatory business reason for each of the supposed instances of discrimination. Although there were instances where Coleman was directed to perform more basic duties, this reflects a legitimate interest in balancing the training of the worker with increasing the productivity of the gang. The evidence establishes that Coleman was given training like other members of the gang, and indeed was eventually promoted to signalman. The lengthy trips to town for bathroom breaks by Coleman and others were adversely affecting the productivity of the gang, removing from the job site not only the worker who took the truck, but all of the tools and emergency communication equipment carried in the truck. The port-a-potty was adopted as a means to provide bathroom breaks on site, and was used by all members of the gang. Tools were assigned to the truck, not to individual workers. And the "overtime pay" cited by Coleman was in fact extra pay for working out of the gang's assigned district. Eventually, the defendant moved Coleman's gang (not just Coleman) back to its assigned work district so that another gang could earn the extra out-of-district pay. The desire to spread such extra pay for out-of-district work among all workers, rather than reserving it in perpetuity to one gang alone, was a legitimate business purpose.

The court finds that summary judgment is appropriate as to Coleman's claims of illegal retaliation. First, the plaintiff has failed to demonstrate the existence of a prima facie case of retaliation because there is no evidence he was subjected to an adverse employment action. An adverse employment action, in this context, requires more than minor disappointments in the work environment — it must constitute "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits." *Sanchez v. Denver Public Schools*, 164 F.3d 527, 531 (10th Cir. 1998). Here, as noted earlier, the various events cited by Coleman simply do not rise to this level of gravity. To the contrary, all of the racial slurs he cites occurred *before* his complaint. After the complaint, Coleman was in fact promoted to signalman and his work assignments improved.

11

Because the court finds that Coleman's harassment, discrimination, and retaliation claims should be dismissed on the grounds cited, it need not address the alternative issues presented in the defendant's brief such as the argument against Coleman's claim for punitive damages. The claims of the plaintiff are without merit for the reasons stated, and the present action is hereby dismissed.

IT IS ACCORDINGLY ORDERED this 9th day of March, 2006, that the defendant's Motion for Summary Judgment is granted.

s/ J. Thomas Marten<br>
J. THOMAS MARTEN, JUDGE